**In re ALAMOSA HOLDINGS, INC. Securities Litigation**

**No. Civ.A.5:03CV289–C.**

United States District Court, N.D. Texas, Lubbock Division.

March 28, 2005.

Darren J. Robbins, William S. Lerach, Lerach Coughlin Stoia Geller Rudman & Robbins, Ramzi Abadou, San Diego, CA, Timothy J. Crowley, Crowley Douglas & Norman, Houston, TX, Jason R. Llorens, Jeff S. Westerman, Jonathan E. Behar, Lerach Coughlin Stoia Geller Rudman & Robbins, Los Angeles, CA, Roger F. Claxton, Robert J. Hill, Claxton & Hill, Dallas, TX, David A. Rosenfeld, Samuel H. Rudman, Geller Rudman, Melville, NY, Jack G. Fruchter, Fruchter & Twersky, New York City, Marc A. Topaz, Rich Maniskis, Schiffrin & Barroway, Bala Cynwyd, PA, Andy Wade Tindel, Law Office of Andy Tindel, Tyler, TX, Christopher J. Keller, Goodkind Labaton Rudoff & Sucharow, New York City, Jonathan M. Plasse, Goodkind Labaton Rudoff & Sucharow, Chris Hinton, Fred T. Isquith, Gregory M. Nespole, Wolf Haldenstein Adler Freeman & Herz, New York City, Marc S Henzel, Law Office of Marc S. Henzel, Bala Cynwyd, PA, Jason B. Stephens, Stephens & Anderson, Fort Worth, TX, Bruce G. Murphy, Law Offices of Bruce G. Murphy, Vero Beach, FL, Eric J. Belfi, Murray Frank & Sailer, New York City, W.D. Masterson, III, Kilgore & Kilgore, Dallas, TX, for Plaintiffs.

George W. Bramblett, Jr., Carrie Lee Huff, Heather Lee Perttula, Noel M.B. Hensley, Haynes & Boone, Dallas, TX, Matt D. Matzner, Crenshaw Dupree & Milam, Lubbock, TX, Richard Eugene Norman, Crowley Douglas & Norman, Houston, TX, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

CUMMINGS, District Judge.

On this date, the Court considered:

(1) Defendants' Motion to Dismiss and Supporting Brief along with the Appendix in Support, filed July 26, 2004;

(2) Plaintiffs' Opposition to Defendants' Motion to Dismiss, filed September 9, 2004 ("Response");

(3) Defendants' Reply to Plaintiffs' Response, filed September 29, 2004; and

(4) Plaintiffs' Consolidated Class Action Complaint for Violations of the Fed-

eral Securities Laws ("Complaint"), filed May 18, 2004.

## I.

## PROCEDURAL HISTORY

On November 19, 2003, the first of several complaints were filed against Defendants Alamosa Holdings, Inc. ("Alamosa"), Kendal W. Cowan ("Cowan"), David E. Sharbutt ("Sharbutt"), and Steven C. and Michael V. Roberts ("Roberts Brothers"). After several lawsuits were filed by different Plaintiffs, motions to consolidate the cases and appoint a lead plaintiff were filed. The Court entered an order *nunc pro tunc* requiring that all motions to consolidate be filed by February 12, 2004. On February 27, 2004, the Court ordered the consolidation of five pending suits into Civil Action No. 5:03–CV–00289–C.[1] The Court appointed Massachusetts State Guaranteed Annuity Fund as Lead Plaintiff and approved its selection of Lead Counsel on March 4, 2004. Plaintiffs filed their Consolidated Complaint on May 18, 2004. On July 14, 2004, the Court granted leave to exceed the page limitations for briefs. Defendants filed their Motion to Dismiss and Appendix in Support on July 26, 2004. Plaintiffs filed their Response on September 9, 2004. Defendants' Reply was filed on September 29, 2004. The Court denied a request for oral arguments by Order dated October 19, 2004. On December 7, 2004, the Court granted in part and denied in part Plaintiffs' Motion to Strike certain exhibits contained in Defendants' Appendix to their Motion to Dismiss.[2]

## II.

## OVERVIEW

This action arises out of Plaintiffs' purchase of Alamosa's publicly traded securities in an alleged class period from January 9, 2001 to June 13, 2002. Lead Plaintiff, Massachusetts State Guaranteed Annuity Fund, as well as the other Plaintiffs in the consolidated action, allegedly purchased Alamosa's securities during the alleged class period. Plaintiffs base their claims on alleged misstatements and/or omissions regarding Alamosa's subscriber numbers and the effect of those subscriber numbers on uncollectible accounts receivable and revenues. Plaintiffs assert claims of strict liability and negligence under §§ 11 and 15 of the Securities Exchange Act of 1933 ("1933 Act"). Plaintiffs also assert claims of securities fraud for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Securities and Exchange Commission ("SEC") Rule 10–b(5) promulgated under the 1934 Act at 17 C.F.R. § 240.10b–5. Plaintiffs bring their claims against Alamosa, its Chief Executive Officer (Defendant Sharbutt), its Chief Financial Officer (Defendant Cowan), and two of Alamosa's outside directors (Defendants Roberts Brothers).

Alamosa, one of the largest Sprint PCS Network affiliates, sells wireless communications services. Alamosa provides wireless services under the Sprint brand name in a exclusive territory located primarily in Texas, New Mexico, Arizona, Colorado, Wisconsin, Illinois, Oklahoma, Kansas,

---

**1.** The five consolidated suits included (1) *Broadway Assocs., Inc. v. Alamosa Holdings, Inc., et al.,* Cause No. 5:03–CV–289–C; (2) *Joseph Russo v. Alamosa Holdings, Inc., et al.,* Cause No. 5:03–CV–312–C; (3) *Stanley Sved v. Alamosa Holdings, Inc., et al.,* 5:03–CV–317–C; (4) *David P. Sharbutt v. Alamosa Holdings, Inc., et al.,* 3:03–CV–2937–N (Dallas

Division); (5) *Eddie Bird v. Alamosa Holdings, Inc., et al.,* 5:04–CV–018–C.

**2.** Specifically, Exhibits 30, 31, and 38, and any references to them, were stricken from Defendants' Motion to Dismiss; however, Exhibits 6 and 7, and any references to them, were not stricken.

Missouri, Washington, and Oregon. Alamosa owns and is responsible for building and managing the portion of Sprint's PCS network located in its territory, as well as for marketing and distributing Sprint PCS products and services throughout its territories. Alamosa's stock began trading on the NASDAQ exchange in February of 2000 and on the NYSE in the fall of 2001.

On January 12, 2001, Alamosa registered certain additional shares of its common stock pursuant to a stock registration statement (the "Registration Statement") that Defendants assert was for issuance as consideration to the former owners of two other Sprint PCS affiliates that Alamosa had contracted to purchase. In February of 2001, Alamosa acquired Roberts Wireless from the Roberts Brothers, and a portion of the common stock issued under the Registration Statement was exchanged to the Roberts Brothers as consideration for the sale of their company. In connection with the acquisition, the Roberts Brothers became members of Alamosa's board of directors. Following the expiration of a lock-up period, the Roberts Brothers began selling a portion of their shares in October of 2001. The Roberts Brothers sold approximately one-third of their Alamosa shares given to them in exchange for their company. It is not alleged, nor have any SEC filings supported, that Defendants Cowan or Sharbutt sold any of their shares during the putative class period.

Sprint develops service plans for its affiliates, including Alamosa, to market Sprint's products and services to subscribers. At the time of the January 12, 2001 Registration Statement and continuing until May 2001, the Sprint plans required certain customers who did not satisfy specified credit criteria to make a deposit upon the initiation of services, which could be credited against future billings. In May of 2001, Sprint made a change to its service plans by implementing a plan called "No Deposit Account Spending Limit" ("NDASL"). Sprint's NDASL plan eliminated the earlier deposit feature but maintained a spending limit on the account. This plan lasted until November of 2001, after which Sprint refined its plan to reimpose a deposit requirement for limited classes of subscribers. The refined November 2001 plan was called "Clear Pay." Alamosa added a majority of its new subscribers from May 2001 to early the following year under the NDASL and Clear Pay plans. Alamosa suspended the credit deposit requirement in May of 2001 and did not reinstate it until February of 2002. In February of 2002, Alamosa announced that it was reinstating its deposit requirements for high-risk credit customers.

Each quarter Alamosa disclosed its financial performance for the quarter and the subscriber additions it had received. Alamosa also recorded the revenues associated with the subscribers and estimated on its balance sheet an amount representing the portion of total accounts receivable that may not be collected. On its income statement, Alamosa recorded as an expense the amount it assessed for bad debt associated with the current revenues.

On May 1, 2002, Alamosa projected that it would add 30,000 to 35,000 net new subscribers for that current quarter (second quarter of 2002); however, on June 13, 2002, still within that quarter, Alamosa made a public announcement lowering its projected subscriber growth to a revised range of 15,000 to 25,000. Following the announcement, Alamosa's stock price dropped from $1.47 per share on June 13, 2002 to $1.31 per share on June 14, 2002 (approximately an 11 percent drop in share price).[3] The stock price had already de-

---

**3.** The Court takes judicial notice of the closing stock price of Alamosa on the referenced dates. The stock price is also referenced in Exhibit 36 of Defendants' Appendix.

clined significantly from its highs before the June 13, 2001 revision.

Plaintiffs allege that Defendants made a series of false and misleading statements of fact and/or omissions about subscriber additions. Plaintiffs further allege that Defendants "caused Alamosa to report false financial results via the use of improper revenue and expense recognition, thereby materially [understating] its losses during the Class Period." Compl. at ¶ 3. Plaintiffs allege that "Alamosa's financial statements were false and misleading for all four quarters of fiscal 2001 and the first quarter of fiscal 2002, [and] were not fair presentations of its results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules." *Id.* Specifically, Plaintiffs allege, "Alamosa's false financial results were included in Alamosa's public press releases as well as quarterly Forms 10–Qs and the annual Form 10–K filed with the SEC." *Id.* Plaintiffs allege that

> [t]hroughout the Class Period, defendants caused Alamosa to disseminate false financial statements and misrepresent the truth about its subscriber growth in order to allow defendants to: (i) raise $481 million by selling of Alamosa securities to unsuspecting investors so that Alamosa could pay down its debt and obtain waivers from its lenders given that it was operating in violation of covenants associated with its outstanding credit facility; (ii) keep the price of Alamosa stock inflated so that Alamosa could attempt to use its stock to acquire additional subscribers in order to meet defendants' promised subscriber growth; and (iii) allow director defendants Michael V. Roberts and Steven C. Roberts to cash out over $60 million worth of

their own shares, or more than 32% of their Alamosa shareholdings.

Compl. at ¶ 5.

Plaintiffs' Complaint rests primarily upon the subscriber numbers. *See* Pl. Resp. at 1 ("Alamosa's operational success and corresponding stock price were, during the [putative class period], wholly dependent on attracting and retaining wireless subscribers"). In essence, Plaintiffs allege that Defendants' representations about Alamosa's growth were false because the subscriber growth was allegedly due, in large part, to Alamosa's entering into contracts with non-creditworthy subscribers and misrepresenting Alamosa's subscriber base by signing up non-existent subscribers. Plaintiffs allege that Defendants, by including the credit-risk subscribers and non-existent subscribers, caused Alamosa to falsify its reported financial results through its improper accounting for revenues, accounts receivable, and bad debt expense, thus resulting in materially and artificially inflated sales, income, assets, and shareholder equity. Plaintiffs allege that Defendants were motivated to show strong subscriber growth in order to complete several debt offerings and a common stock offering, to show the market that Alamosa was meeting the terms of its affiliate agreement with Sprint, and to privately show Alamosa's lenders that it was meeting its financial and statistical credit covenants. Plaintiffs further allege that "[D]efendants knew that these same subscribers would later cause massive subscriber defaults and service disconnections." Compl. at ¶ 9.

Defendants counter that this lawsuit is based entirely upon projections that did not come to pass and the resulting decline in stock price. Defendants contend that Alamosa's net subscriber growth exceeded its forecasts for all four quarters of fiscal year 2001 and for the first quarter of 2002,

and in fact, Alamosa increased its projected subscriber growth several times during the year. Defendants further contend that Alamosa reached its forecast of 500,000 subscribers at year end 2001. Defendants assert that the only time they lowered estimated subscriber projections was for the second quarter of 2002 when they made the June 13, 2002 revision statement. Defendants assert that Plaintiffs have no cause of action because the Complaint's primary allegations relate to Alamosa's May 1, 2002 estimate of net subscriber additions for the second quarter of 2002 and Alamosa's June 13, 2002 announcement revising that forecast.[4] Defendants reason that such statements as the May 1, 2002 projection are forward-looking, identified as forward-looking, and accompanied by meaningful cautionary language; thus, the statements, including the May 1, 2002 statement, fall within the safe harbor of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u–4 and 78u–5 ("PSLRA"). Defendants further counter that Plaintiffs have recognized the weakness of a case based on forward-looking statements and have added allegations of misrepresentations of historical fact-that Defendants misstated revenues and bad debt. Defendants asserts that Plaintiffs' allegations that Alamosa should have disregarded any revenue from the new subscribers or increased allowances for doubtful accounts are without any factual basis to support such a conclusory assertion. Defendants also argue that Plaintiffs have failed to sufficiently allege facts that would give rise to a strong inference of scienter. Finally, Defendants contrast Plaintiffs' lawsuit to a majority of securities lawsuits challenging accounting practices, in that Alamosa has never been required to restate its financial statements.

## III.

## STANDARDS

### A. Standard for Motion to Dismiss

■ Motions to dismiss for failure to state a claim are appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim. FED. R. CIV. P. 12(b)(6). The test for determining the sufficiency of a complaint under Rule 12(b)(6) was set out by the United States Supreme Court as follows: "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Grisham v. United States*, 103 F.3d 24, 25–26 (5th Cir.1997). Subsumed within the rigorous standard of the *Conley* test is the requirement that the plaintiff's complaint be stated with enough clarity to enable a court or an opposing party to determine whether a claim is sufficiently alleged. *Elliott v. Foufas*, 867 F.2d 877, 880 (5th Cir.1989). Further, "the plaintiff's complaint is to be construed in a light most favorable to the plaintiff, and the allegations contained therein are to be taken as true." *Oppenheimer v. Prudential Sec., Inc.*, 94 F.3d 189, 194 (5th Cir. 1996). However, the Court will not accept conclusory allegations in the complaint as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir.1982); *Robertson v. Strassner*, 32 F.Supp.2d 443, 445 (S.D.Tex.1998); *Zuckerman v. Foxmeyer Health Corp.*, 4 F.Supp.2d 618, 621 (N.D.Tex.1998). In ruling on a motion to dismiss a securities fraud cause of action,

---

4. Defendants argue that all other prior statements regarding quarterly subscriber number projections for the prior five quarters (2001 and first quarter 2002) are not actionable in any way because those numbers were met or exceeded each quarter and year end 2001.

the court may consider (1) documents attached to the complaint or incorporated into it, (2) the contents of relevant public disclosure documents required to be filed and actually filed with the SEC, or (3) documents referenced in the complaint. *See Lovelace v. Software Spectrum,* 78 F.3d 1015, 1017–18 (5th Cir.1996).

## B. Standard for Pleading Securities Fraud

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j, makes it unlawful for a person, either directly or indirectly

> [t]o use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (2000).

In relevant part, Rule 10b–5, promulgated by the SEC under section 10(b), makes it unlawful for any person

> [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading … in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (2001).

Thus, in order to state a claim for securities fraud in violation of section 10(b) and Rule 10b–5, a plaintiff must allege (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiff relied; and (5) that proximately caused the plaintiff's injury. *Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 177 (5th Cir.1997); *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994).

## C. Rule 9(b) Requirements and Particularity Requirements of the PSLRA

Because section 10(b) claims sound in fraud, a plaintiff must also satisfy the pleading requirements imposed by Federal Rule of Civil Procedure 9(b). *Melder v. Morris,* 27 F.3d 1097, 1100 (5th Cir.1994); *Tuchman,* 14 F.3d at 1067. Rule 9(b) requires certain minimum allegations in a securities fraud case, namely, the specific time, place, and contents of the false representations, along with the identity of the person making the false representation and what the person obtained thereby. *Melder,* 27 F.3d at 1100; *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 521 (5th Cir. 1993). This application of the heightened-pleading standard of Rule 9(b) provides defendants with fair notice of a plaintiff's claims, protects them from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs. *Melder,* 27 F.3d at 1100; *Tuchman,* 14 F.3d at 1067.

The PSLRA imposes procedural pleading requirements on plaintiffs pursuing private securities fraud actions. *See Goldstein v. MCI WorldCom,* 340 F.3d 238, 244–45 (5th Cir.2003). In relevant part, the PSLRA, 15 U.S.C. § 78u–4(b)(1), provides that

> [i]n any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
>> (A) made an untrue statement of a material fact; or
>>
>> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading,
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement

is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u–4(b)(1). A plaintiff must plead facts and avoid reliance on conclusory allegations. *Tuchman*, 14 F.3d at 1067; *Coates v. Heartland Wireless Communications, Inc.*, 26 F.Supp.2d 910, 915 (N.D.Tex.1998).

■ Stated more specifically, a plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b–5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u–4(b)(1): (1) specify each statement alleged to have been misleading, i.e., contended to be fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent. *See, e.g., Goldstein*, 340 F.3d at 245 (quoting *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir.2002)). "This is the 'who, what, when, where, and how' required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA." *Id.*

## D. Scienter Requirement

■ Plaintiffs asserting securities fraud claims must also allege facts demonstrating scienter. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir.1996); *Tuchman*, 14 F.3d at 1068; *Zuckerman*, 4 F.Supp.2d at 622. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976);

*Lovelace*, 78 F.3d at 1018. To adequately plead scienter, the plaintiff must set forth specific facts to support a strong inference of fraud. *Goldstein*, 340 F.3d at 245 (quoting *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406–07 (5th Cir.2001)); *Tuchman*, 14 F.3d at 1068. The PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state *with particularity* facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). When a complaint fails to plead scienter in conformity with the PSLRA, dismissal is required. 15 U.S.C. § 78u–4(b)(3)(A); *Coates v. Heartland Wireless Communications, Inc.*, 55 F.Supp.2d 628, 634 (N.D.Tex.1999).

■ A plaintiff may plead scienter by pleading facts which identify circumstances indicating a defendant's conscious or *severely* reckless behavior. *Goldstein*, 340 F.3d at 245–46 (emphasis added). Severe recklessness is defined as being "limited to those *highly unreasonable* omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware." *Nathenson*, 267 F.3d at 408 (quoting *Broad v. Rockwell*, 642 F.2d 929, 961 (5th Cir.1981) (en banc)) (emphasis added). A plaintiff may also allege facts to show that a defendant had both motive and opportunity to commit fraud in order to enhance the strength of the inference of scienter. *Nathenson*, 267 F.3d at 412. But allegations of motive and opportunity alone will not fulfill the pleading requirements. *Id.*

■ A court may cumulatively consider the scienter evidence pleaded by a plain-

tiff, *Goldstein,* 340 F.3d at 247, so long as the totality of the allegations raises a strong inference of fraudulent intent. *Zuckerman,* 4 F.Supp.2d at 623; *Robertson,* 32 F.Supp.2d at 447. Properly pleaded circumstantial evidence will suffice to withstand dismissal if the circumstantial evidence justifies a strong inference of scienter. *Nathenson,* 267 F.3d at 424–25. "However, [a court] will not 'strain to find inferences favorable to the plaintiffs'" when construing whether scienter allegations have been sufficiently pleaded. *See Goldstein,* 340 F.3d at 244 (quoting *Westfall v. Miller,* 77 F.3d 868, 870 (5th Cir. 1996)) (brackets omitted).

## IV.

### DISCUSSION

Plaintiffs allege that misstatements of fact and/or omissions were made by the Defendants when reporting and commenting on Alamosa's subscriber numbers and the effect those numbers had on the amount of revenue and bad debt due to uncollectible subscriber accounts. Plaintiffs allege that financial statements and public statements reporting strong growth in subscriber numbers and revenues were made while Defendants knew, or were severely reckless in disregarding, that a material amount of subscriber accounts would be uncollectible and that financial results were positively skewed by failing to establish proper and timely reserves for accounts receivable.

Defendants argue that the statements which Plaintiffs allege as false or misleading are nothing more than general ex-

pressions of optimism accompanied by cautionary warnings, thus making them non-actionable. Defendants further argue that Plaintiffs' Complaint contains conclusory allegations of fraud and therefore fails the stringent-pleading requirements for a securities fraud case. Defendants assert that the Complaint contains many general and non-specific allegations. Defendants move the Court for an order dismissing the Complaint, arguing that the Complaint is wholly inadequate as pleaded. Plaintiffs counter that the Court is to determine the sufficiency of the Complaint after considering the allegations in their entirety.[5]

### 1934 ACT

### A. SUBSCRIBER PROJECTIONS AND THE MAY 1, 2002 PRESS RELEASE

Defendants argue that the impetus for this lawsuit was Alamosa's June 13, 2002 downward revision of its second quarter 2002 subscriber projection numbers. Defendants further argue that no claim exists based upon Alamosa's initial guidance projecting that second quarter 2002 subscriber additions would be between 30,000 to 35,000. Defendants contend that (1) the projection falls within the "safe harbor" provisions of the PSLRA, (2) the projection was reasonable when made and the Complaint fails to plead facts that demonstrate otherwise, and (3) the Complaint merely shows that the projection was revised and ultimately proved to be inaccurate. Defendants argue that this is a

---

**5.** However, if the Complaint repeatedly fails to meet the pleading requirements in specific areas, the Court cannot aggregate insufficient allegations/pleadings in order to arrive at a conclusion of sufficiency when viewed as a whole. *See Galileo Corp. Shareholders Litig.,* 127 F.Supp.2d 251, 262 (D.Mass.2001) ("The plaintiffs argue that the court should consider

the allegations in the aggregate—an approach which the plaintiffs say will reveal a pattern of fraud on the part of the defendants.... Our law requires that the court consider each of plaintiffs' allegations separately...."). The burden will rest on the Plaintiffs to sufficiently plead their case—specifically, each element with the required particularity.

classic example of a claimed "fraud by hindsight."

Plaintiffs appear to abandon their claims based on the May 1, 2002 subscriber *projection numbers*. *See* Resp. at 32. However, Plaintiffs do argue that the May 1, 2002 projection was not protected by the safe harbor provisions.

**PSLRA Safe Harbor**

The PSLRA protects forward-looking statements under the "safe harbor" provisions relating to projections and future performance. *See* 15 U.S.C. § 78u–5(c)(1). The safe harbor provisions were enacted to allow public companies to disclose their projections and plans without the threat of abusive litigation. *See* H.R. Conf. Rep. No. 104–369, 42–43 (Nov. 28, 1995). Defendants argue that a court must dismiss a complaint that attempts to impose liability (a) when the statement is identified as forward-looking and is accompanied by meaningful cautionary statements identifying important factors that could cause the actual results to materially differ from the projected results, (b) when the statement is immaterial, or (c) even when the statement is not accompanied by the cautionary language and is material but the complaint fails to plead facts sufficient to show that the statement was made with "actual knowledge" of its falsity. *See* Def. Mot. Dismiss at 11 (citing 15 U.S.C. § 78u–5(c)(1)(A) and (B)). Thus, the Court will analyze each of these three contentions of protection under the safe harbor provision.

*1. Forward-looking and accompanied by meaningful cautionary language*

■ First, Defendants argue that the May 1, 2002 press release statement is explicitly identified as forward-looking.

Statements contained in this news release that are forward-looking statements, such as statements containing terms such as can, may, will, expect, plan and similar terms, are subject to various risks and uncertainties. Such forward-looking statements are made pursuant to the "safe-harbor" provisions of the Private Securities Litigation Reform Act of 1995 and are made based on management's current expectations or beliefs as well as assumptions made by, and information currently available to, management.

*See* Def. Ex. 28 at Def.App.1946.

Defendants further argue that meaningful cautionary language brought to investors' attention a number of important factors, any of which could cause the actual results to differ materially from the projected results. The May 1, 2002 press release explicitly warned that "[a] variety of factors could cause actual results to differ materially from those anticipated in Alamosa's forward-looking statements," and specifically included a reference to "changes in Sprint's national service plans or fee structure[s]." *Id.* Defendants argue that the changes to Sprint's service plans and fees are the basis of Plaintiffs' claims in that Plaintiffs allege that Defendants failed to properly require credit deposits on high-risk customers.

The warning went on to specifically list "adverse changes in financial position, condition or results of operations." *Id.* Moreover, Defendants argue that the May 1, 2002 press release expressly pointed the reader to the "risk factors" section of Alamosa's 10–K for the fiscal year ending December 31, 2001. *See id.* Alamosa's 2001 10–K was filed on March 29, 2002, prior to the May 1, 2002 statement. *See* Def.App. at 1701. The "risk factors" section of the 10–K cautioned of risks such as weakening economy and recession, competition, and customer turnover. *See* Def. App. at 1639–48. Moreover, the 2001 10–K expressly addressed the very risk that Plaintiffs allege was not disclosed—the risk that if a deposit requirement was rein-

stated, subscriber growth could decrease. *Id.* at 1611.

> Sprint has the right to end or materially change the terms of the ASL [ (account spending limit) ], NDASL/Clear Pay program or any other program in its sole discretion. If Sprint chooses to do away with the ASL or NDASL/Clear Pay program or reintroduce the deposit requirement nationwide, the growth rate we have experienced could decrease and the decrease may be significant.

*See* Def.App. at 1611.

Defendants further argue that investors were put on notice time and time again that changes to programs could cause significant decline in Alamosa's attraction of new subscribers. *See* Def. Ex. 8 (10/18/01 Form S–1) at App. 954–55; Ex. 9 (10/25/01 Form S–1/A) at App. 1157–58; Ex. 10 (10/30/01 Prospectus Supplement) App. at 1317; Ex. 11 (11/6/01 Form S–1/A) App. at 1367–68. The crux of Defendants' safe harbor argument is that Plaintiffs do not have a claim for misrepresentation or omission because actual disclosures warn investors of the very risks that Plaintiffs allege were not disclosed. *Melder v. Morris*, 27 F.3d 1097, 1100–01 (5th Cir.1994); *Capstead*, 258 F.Supp.2d at 555–56; *Rosenzweig v. Azurix*, 332 F.3d 854, 869 (5th Cir.2003); *Blockbuster*, 2004 WL 884308 at *4–6. Moreover, as discussed above, Defendants argue that the May 1, 2002 projection was identified as forward-looking.

Although Plaintiffs concede that they are not challenging the forward-looking projection numbers, *see* Resp. at 32, Plaintiffs counter that the Court should not accept at this stage whether the items mentioned in express cautionary language were those items thought at the time to be the, or any of the, important sources of variance. *See* Resp. at 32. Plaintiffs also argue, with regard to the forward-looking projections, that whether a forward-looking statement includes meaningful caution-ary language cannot be decided at the pleading stage because the statutory requirement that meaningful cautionary language be included is not itself meaningful or clear. The Court cannot agree because the plain meaning of the statute is clear. *See* 15 U.S.C. § 78u–5(c)(1).

Next, Plaintiffs argue that Defendants' cited warnings were inadequate, meaningless, and mere boilerplate. *See* Resp. at 33–34 (citing *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir.2004)). Plaintiffs further rely upon *Asher* to argue that Defendants' cautionary language remained fixed while the risks changed. *Id.* at 734. Plaintiffs fail to explain how *Asher* is relevant in this instance because the very risks Plaintiffs are complaining of were expressly contained in the "static" cautionary language.

The Court finds that the language in this instance was forward-looking and sufficient to clearly warn investors of the risks—in fact, the very risk at issue here. *See* Reply at 6 (citing sufficient sources for allowing determination of sufficiency of cautionary language on a motion to dismiss).

### 2. Immateriality

Defendants' second safe harbor argument is that the May 1, 2002 projection of subscriber growth is immaterial because it was not worded as a guarantee and is thus inactionable. *Rosenzweig*, 332 F.3d at 869; *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 359 (5th Cir.2002) (same); *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir.1993) (same).

Plaintiffs counter that "[m]ateriality is a mixed question of fact and law" and the Complaint should not be dismissed "unless the alleged misstatements and omissions are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their impor-

tance.'" *See* Resp. at 11 (citing *Kurtzman v. Compaq Computer Corp.*, No. H–99–779, 2000 WL 34292632, at *39, 2000 U.S. Dist. LEXIS 22476, at *134 (S.D.Tex. Dec. 12, 2000)). Plaintiffs argue that contested factual allegations should not be adjudicated at this stage. *Id.* at 12. Plaintiffs further argue that "inferences drawn in plaintiffs' favor result in the inescapable conclusion that Alamosa's errors go far beyond plaintiffs' specific examples" and "[i]ndeed, allegations of materiality should not be considered in isolation." *Id.*

■ However, materiality is a mixed question of fact and law that may be reviewed by a court in ruling on a motion to dismiss to determine if representations are immaterial as a matter of law. *See, e.g., In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F.Supp.2d 549, 573 (S.D.Tex.2002) (citing *ABC Arbitrage*, 291 F.3d at 359). Thus, the Court finds that, as a matter of law, the projection for subscriber numbers was clearly identified as just that, a projection, and not a guarantee—it was immaterial.

### 3. Actual knowledge that May 1, 2001 statement not true

■ The safe harbor provision does not apply where the defendants knew at the time that they were issuing statements that the statements contained false or misleading information and thus lacked any reasonable basis for making them. *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 235 F.Supp.2d 549, 576 (S.D.Tex.2002). The Fifth Circuit has held that projections do not constitute misrepresentations where the complaint fails to plead specific facts demonstrating that there was no reasonable basis for the forecast at the time it was made or there were specific undisclosed facts known to the speaker at the time the projection was made which tended to seriously undermine the accuracy of the forecast. *See Rosenzweig v. Azurix*, 332 F.3d 854, 868 (5th Cir.2003). Conclusions will not suffice. *Id.* Thus, the Court must analyze the parties' arguments and the allegations of the Complaint regarding whether the Defendants knew of undisclosed facts making the subscriber projection numbers unreasonable, thus allowing those projections to be actionable even though identified as forward-looking projections accompanied by meaningful cautionary language.

Defendants argue that even if the cautionary language was somehow deficient, the Complaint fails to allege facts establishing that the May 1, 2002 subscriber projections were made by or with approval of any Defendant who had actual knowledge that the projection was not true. *See* 15 U.S.C. § 78u–5(c)(1)(B). Defendants contend that the Complaint is bare of specific facts that show actual knowledge of falsity on the part of any Defendant for the May 1, 2002 projection. Defendants assert that Plaintiffs merely make conclusory allegations that Defendants "knew" of the "truth" because of the alleged access to unspecified reports and their alleged participation in unspecified meetings and conversations. *See* Compl. at ¶¶ 22–23, 26–27, 29–30, 154. Defendants further argue that because Alamosa had actually realized 48,000 net new subscribers in the first quarter of 2002, a projection of 30,000 to 35,000 in the second quarter was not unreasonable. Finally, Defendants argue that the Complaint is completely absent of facts showing what information was known to the Defendants, how such information would have rendered the May 1, 2002 projection unreasonable when made, and that the Defendants failed to consider any such information when making the projection. Defendants summarize that they are not required to be clairvoyant and any allegations that they should have anticipated future events or made certain disclosures earlier than they actually did do not suffice

to make out a claim for securities fraud. *See Eizenga v. Stewart Enterprises, Inc.,* 124 F.Supp.2d 967, 985 (E.D.La.2000).

Plaintiffs argue that "[a]s discussed herein, plaintiffs have established defendants' knowledge that their May 1, 2002 statement was false when made." *See* Resp. at 33 (citing Compl. at ¶¶ 3–15, 21–34, 45–76, 130–150). Plaintiffs provide no other argument to rebut Defendants' contention that the Complaint is conclusory and absent of specific facts to support the allegations. Nor do Plaintiffs rebut the argument that the Complaint relies upon unspecified meetings and conversations.

The Court finds that under the PSLRA and Rule 9(b), Plaintiffs' allegations cannot rest on the cited paragraphs of the Complaint—more is required. The Complaint does not sufficiently plead, beyond a conclusory fashion void of specific factual allegations, that Defendants had actual knowledge undermining the subscriber projection numbers in the May 1, 2002 statement or that such projections were unreasonable when made.

Based upon the above three arguments pertaining to the PSLRA, Defendants argue that the PSLRA is an absolute bar to Plaintiffs' claims based on Alamosa's failure to achieve its May 1, 2002 subscriber number projection and, as such, the claims should be dismissed. The Court agrees and finds that the PSLRA bars Plaintiffs' claims based upon the May 1, 2002 subscriber projection numbers. As such, any claims based upon the May 1, 2002 subscriber *projection numbers* are DISMISSED with prejudice.

**Duty to Revise the May 1, 2002 Subscriber Projections Earlier**

██ Defendants assert that the Complaint improperly alleges that Alamosa should have revised its guidance for the second quarter subscriber projections before June 13, 2002. Defendants argue that a Company is under no duty to update forward-looking projections because the voluntary disclosure of an earnings forecast or forward-looking statement does not trigger any duty to update. Defendants contend that Alamosa was free to disclose or not disclose whether its forecast had changed. Once Alamosa made the decision to disclose a change in forecast, Defendants argue, the timing of said decision is a matter of business judgment that is left up to the corporate officers. *See R2 Investments v. Phillips,* 2003 WL 22862762, at *6 (N.D.Tex. Dec. 3, 2003) ("There is no Rule 10b–5 omission just because the Individual Defendants took longer to disclose than the Plaintiff would have liked."); *Berger v. Beletic,* 248 F.Supp.2d 597, 603 (N.D.Tex.2003) (taking longer to report information than plaintiff would have liked is no omission because information was actually reported—just not as soon as plaintiff would have preferred—and the timing is a matter of business judgment as long as defendants abide by the affirmative disclosure requirements of the SEC).

Defendants further argue that the Complaint alleges that another of Sprint's affiliates announced just days earlier that it, too, was lowering its own subscriber forecasts for the second quarter. Defendants state that no specific allegations appear as to why a week's difference between the revisions of the two affiliates creates a fraud. Defendants argue that, in any event, Plaintiffs could not have been misled during the seven-day difference because Plaintiffs themselves allege that the market already suspected that Alamosa might have to lower its own subscriber numbers in the future because Alamosa's stock price dropped considerably upon the other affiliate's prior announcement.

Plaintiffs do not specifically address Defendants' argument regarding the timing of the second quarter 2002 subscriber

number projection revision. *See* Reply (no specific argument regarding timing of revision). However, based on Defendants' arguments and the fact that the Complaint failed to allege with any specificity on what basis Defendants were required to make an earlier revision, the Court finds that no claim exists on such allegations.

### B. MISSTATEMENTS OTHER THAN THE MAY 1, 2002 SUBSCRIBER PROJECTIONS

Defendants argue that Plaintiffs' claim based on the May 1, 2002 subscriber projection is obviously so flawed that Plaintiffs have stuffed the Complaint with a hodge-podge of other allegations, also based on the May 1, 2002 statement, which still do not state a claim. Moreover, Defendants argue that the entire basis of the Complaint is that the NDASL/Clear Pay plans were fraudulent and misleading; however, the plans were clearly and fully disclosed and are inactionable because of the disclosure. *See* Reply at 11 (citing Ex. 8 at App. 954–55; Ex. 11 at App. 1344; Ex. 13 at App. 1611).

Plaintiffs counter "that *most* of the false and misleading statements identified with particularity in the Complaint are actionable." *See* Resp. at 31 (emphasis added). Plaintiffs go on to argue that Defendants ignore that the majority of the Complaint is lined with statements (including the May 1, 2002 statement) of present and historical facts which are not sheltered from liability. *In re Keithley Instruments, Inc. Sec. Litig.*, 268 F.Supp.2d 887, 904 (N.D.Ohio 2002). However, Plaintiffs do not specify which of the alleged *"other* statements" throughout the Complaint meets this description; rather, Plaintiffs only argue "[w]ith respect to one statement—Alamosa's May 1, 2002 press release." *See* Resp. at 31–35.[6]

Plaintiffs further argue that the May 1, 2002 statement was not forward-looking when referencing the prior quarter's total subscribers, revenue, and revenue increases. *See* Resp. at 32; Compl. ¶ 120. Plaintiffs argue that the statement clearly con-

---

**6.** The only other statements argued in the Response and specifically attributed to a specific Defendant are mentioned in passing regarding allegations that Defendant Cowan made oral misrepresentations on June 28, 2001, *see* Resp. at 33 n. 34 (citing Compl. at ¶ 89), and that Defendant Sharbutt made oral misrepresentations on December 6, 2001. *Id.* (citing Compl. at ¶ 114).

The Court finds that the two alleged oral misrepresentations referenced in the Complaint at ¶¶ 89 and 114 were nothing more than corporate cheerleading which any reasonable investor would not have relied upon. *See Nathenson,* 267 F.3d at 419; *BMC Software,* 183 F.Supp.2d at 888; Mot. Dismiss at 29 n. 21 (citing numerous authorities).

Also, the other aspects of the statements are inactionable. As an example, the Cowan statement, *see* Compl. at ¶ 89, is alleged to contained a reference to second quarter 2001 subscriber projections of between 37,000 and 42,000. That number was met or exceeded and has never been the subject of a corrective disclosure. Plaintiffs cannot simply allege the projection to have been false or misleading without alleging supporting particulars and why the statement was false or misleading beyond the Complaint's conclusory statements that Defendants "knew" of the "truth."

The statements in paragraph 114 of the Complaint attributed specifically to Defendant Sharbutt are clearly forward-looking and corporate cheerleading. *See* Compl. at ¶ 114.

The Court also notes that, though not specifically argued in the Response, paragraphs 104 and 107 mention Defendant Sharbutt specifically; however, those statements are clearly corporate cheerleading. *See* Compl. at ¶ 104 ("defendants'" press release stated, "We are very pleased with our third quarter subscriber growth...."); *Id.* at ¶ 107 ("We saw annualized incremental penetration during the quarter of 3.4 percent driven by our demonstrated ability to leverage the attractive Sprint PCS product and service offerings in our markets.").

tains some representations of past facts and is thus undeniably actionable. *In re VIVENDI UNIVERSAL, S.A. Sec. Litig.*, No. 02 Civ. 5571(HB), 2003 WL 23724667, 2003 U.S. Dist. LEXIS 19431, at *65 (S.D.N.Y. Nov. 3, 2003). Plaintiffs draw the inference that because the Complaint alleges that all subscriber numbers during the proposed class period included less creditworthy customers, any statements based on those numbers must be false or misleading statements of past fact. The Complaint, however, does not contain facts, but rather only conclusory allegations, that could be interpreted as showing that these representations of past facts were indeed misrepresentations.[7] Moreover, the Complaint fails to properly allege that Defendants knew at the time that the customers would not pay. No facts have been alleged to show that the statements were known to be false when made.

Defendants next argue that Plaintiffs' Complaint fails to plead factual particulars necessary to state a claim. Defendants correctly state that the PSLRA and Rule 9(b) require Plaintiffs' allegations to specify each particular statement alleged as misleading, separately identify the speaker, allege when and where the statement was made, plead with particularity the contents of the false representation, what the person had to gain who made the statement, and explain why the statement is misleading. *Goldstein*, 340 F.3d at 246; *ABC Arbitrage*, 291 F.3d at 350; *Blockbuster*, 2004 WL 884308, at *11–12. Moreover, Defendants argue that where virtually all the allegations are based on information and belief, the PSLRA requires the Complaint to state with particularity all the facts on which that belief is based, 15 U.S.C. § 78u–4(b)(1), and if the Complaint fails on any one of the pleading requirements, it must be dismissed.

*Branca v. Paymentech, Inc.*, 2000 WL 145083, at *7 (N.D.Tex. Feb. 8, 2000).

Plaintiffs counter that the Complaint contains a complete section dedicated to pleading particularized facts showing that Alamosa's recorded revenues and allowances were false or without a reasonable basis. *See* Resp. at 12 n. 11 (citing Compl. at ¶¶ 134–144). Plaintiffs argue that the Complaint specifically pleads that Defendants violated GAAP requirements for recording allowances for uncollectible receivables and for recognizing revenues when cash is received. *Id.* at 12–13 (citing Compl. at ¶¶ 140–144). Plaintiffs also argue that the Complaint clearly pleads facts that Alamosa did not follow its own policy of taking into account historical collection experience, current trends, credit policy, and percentage of accounts receivables by aging category. *Id.* at 13 (citing Compl. at ¶¶ 134, 139, 141–144). Plaintiffs next argue that neither Rule 9(b) nor the PSLRA requires the pleading of evidence of the Defendants' allegedly fraudulent conduct. *ABC Arbitrage*, 291 F.3d 336, 356 (5th Cir.2002). However, Plaintiffs do recognize that they are required to specify "the who, what, when, where, and how of [the] alleged securities fraud." *Rubinstein v. Collins*, 20 F.3d 160, 163 (5th Cir.1994). Plaintiffs state that the Complaint does exactly that. *See* Resp. at 6 (citing Compl. at ¶¶ 77–85, 87–96, 99–110, 115–118, 120–122) (what the misstatements were); ¶¶ 22–23, 30, 33, 77–85, 87–96, 99–110, 115–118, 120–122 (who made statements); ¶¶ 86, 97, 111, 119, 123 (why false when made); ¶¶ 10–14, 54–76, 135–38, 143 (how Defendants knew false when made); ¶¶ 5–6, 9, 14, 21–25, 30 (what they obtained thereby).

In support of Plaintiffs' argument that the Complaint adequately alleges Defendants' misstatements and why they were

---

7. Defendants argue that none of those past

numbers was ever restated or proved false.

false when made, Plaintiffs argue that Defendants repeatedly stressed Alamosa's ever increasing number of subscribers, *see* Compl. at ¶¶ 7–8, and that Defendants represented that the number of subscribers grew as follows: (1) from 166,127 on January 9, 2001 (¶¶ 77, 81) to 261,345 by April 10, 2001 (¶ 83), then to 316,000 on July 30, 2001 (¶ 91) to 404,000 on October 25, 2001 (¶ 104), and from 503,000 on January 8, 2002 (¶ 116) to 551,000 on May 1, 2002 (¶ 120). Plaintiffs further allege that in order to convince the market that Alamosa was meeting its growth numbers and to facilitate Defendants' planned sale of their Alamosa shares, Alamosa revised its guidance for the year ending December 31, 2001 upward from 425,000–465,000 to 500,000–525,000. *See* Compl. at ¶ 105. Plaintiffs allege that despite knowing critical problems, Defendants consistently claimed that Alamosa's growth strategies would produce significant value for the shareholders, *see* Compl. at ¶ 80, and that the network build-out was translating into excellent subscriber growth at a rate greater than that of the industry. *See* Compl. at ¶ 81.

Plaintiffs base these allegations on the conclusory assertion that Defendants knew at the time the subscriber numbers were stated that the company was using improper accounting and fictitious subscriber numbers in order to achieve its forecast numbers. Resp. at 8. Defendants argue that, in this regard, the Complaint offers only "boilerplate assertions" of purported knowledge by the grouped "defendants," but contains no alleged facts to show that Defendants Sharbutt and Cowan did not reasonably believe in their views or optimism at the time they expressed them or that either knew of any undisclosed facts that seriously undermined the accuracy of their views. *See* Compl. at ¶¶ 77, 80–81, 83, 89, 91, 104, 107, 114, 116–17, 120. Plaintiffs contend that

[t]aking inferences in plaintiffs' favor leads to the conclusion that Alamosa improperly set its allowances for uncollectible accounts receivable lower than reasonable estimates under the circumstances (in particular, the circumstances that Alamosa had signed up tens of thousands of sub-prime customers without deposits), or did not have the ability to estimate losses, in which case revenue recognition should not have occurred until Alamosa received cash as payment for its services.

*See* Resp. at 13 (citing Compl. at ¶¶ 142–144). However, the Complaint fails to allege any particulars as to what method the Defendants used to make the estimate and why that was unreasonable. Simply alleging in a conclusory fashion is insufficient.

The Court agrees with the Defendants. These statements are inactionable because the Complaint fails to plead facts demonstrating those statements were made with actual knowledge of their falsity. *See* Compl. at ¶¶ 80, 89, 90, 107, 114, 117. Plaintiffs have failed to plead particulars, as is required, to support their contention regarding knowledge. Conclusory allegations disguised as facts will not suffice to survive a motion to dismiss. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir.1982); *Robertson v. Strassner*, 32 F.Supp.2d 443, 445 (S.D.Tex.1998); *Zuckerman v. Foxmeyer Health Corp.*, 4 F.Supp.2d 618, 621 (N.D.Tex.1998). Plaintiffs have surmised that Defendants knew of critical problems because of the positions and access to unspecified reports and meetings. Plaintiffs failed to plead any factual particulars to support such a leap in logic.

### 1. Improperly Counting Subscribers

Defendants contend that the Complaint fails to specify the identities, num-

bers, and descriptions of accounts labeled as "fictitious" or "fraudulent." Defendants further argue that the Complaint lacks specific factual allegations to support a contention that Alamosa actually misrepresented a material number of subscribers obtained through the alleged conduct or that any Defendant was involved in such conduct or knew of any material misconduct.

### a. Confidential Witnesses

The Complaint relies largely upon confidential witnesses for its allegations that fraudulent accounts were created by (1) issuing unnecessary phones to management level Alamosa personnel, (2) double counting cancelled accounts, (3) issuing unauthorized additional accounts to subscribers, and (4) creation of fictitious accounts. The Complaint also relies upon the confidential witnesses to support allegations of misleading investors about the churn-rate numbers and allegations that charges were waived for customers who allegedly wanted to cancel accounts. Defendants argue that the confidential witnesses' statements are simply inadequate to support the broad allegations of the Complaint and that the Complaint does not show that the confidential witnesses were in positions where any possessed information relating to Alamosa's public disclosures or financial accounting.

Plaintiffs must allege sufficient particulars to show the probability that the confidential sources actually possess the information pleaded. See ABC Arbitrage, 291 F.3d at 350. Defendants argue that all of Plaintiffs' confidential sources are alleged to be personnel who worked in sales and marketing out in the field—thus, no allegations are made that any of them worked at Alamosa's corporate headquarters or had a role in drafting or preparing public disclosures and financial statements. Defendants further contend that no allegations are made that these confidential witnesses

had any communications with anyone at the corporate headquarters regarding improper subscriber additions. Moreover, Defendants assert that the Complaint lacks any factual particulars that any of the sources has knowledge to demonstrate what information was before each of the Defendants, or what any of the Defendants may have authorized/directed as to any purportedly fraudulent scheme or practice. Defendants further argue that the Complaint merely alleges that unidentified Alamosa "senior executives" communicated that Alamosa's goal for year-end 2001 subscribers was 500,000, a number readily available in public disclosures. Finally, Defendants argue that the setting of aggressive targets and creating pressure to meet those targets do not amount to a strong inference of scienter. See In re Bristol–Myers Squibb Sec. Litig., 312 F.Supp.2d 549, 568 (S.D.N.Y.2004); In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F.Supp.2d 549, 580 (S.D.Tex. 2002) (allegations that are consistent with normal business activity of a business, standing alone, are insufficient to state a claim of primary liability).

Plaintiffs counter that the Complaint specifically pleads Defendants' "scheme and wrongful course of business used to achieve the increased subscriber growth and [D]efendants' improper revenue and expense recognition regarding new subscribers." See Resp. at 8 (citing Compl. at ¶¶ 54–76, 130–150). Plaintiffs further argue that four of the confidential witnesses "were at Alamosa's management level during the Class Period" and "one of them was an Area/VP Director of Retail Sales, and all of the witnesses were involved in a sales reporting function." Id. at 9 (citing Compl. at ¶¶ 46–53). Plaintiffs argue that every confidential witness was in a position to know what corporate sales initiatives, targets, and methods were planned, implemented, and changed. Id. (citing Compl.

at ¶¶ 45–53). Thus, Plaintiffs contend, "the confidential witnesses sufficiently provide the factual particulars required to explain defendants' schemes throughout the Class Period that are the core to plaintiffs' claims." *Id.*

However, Plaintiffs do not rebut the argument that the Complaint lacks allegations of factual particulars that any of the sources had knowledge to demonstrate what information was before each of the Defendants. Moreover, Plaintiffs' allegations that the setting of aggressive price targets created pressure for these sales and marketing employees to create these allegedly fictional accounts is inadequate to create a strong inference of scienter on Defendants' part. The Complaint fails to properly allege particulars to show that Defendants had knowledge of these acts.

### b. Materiality of actual subscriber numbers

In addition, Defendants contend that no specific facts demonstrate that a material number of improper subscribers was counted; rather, the only number alleged in the Complaint is that 1,000 subscribers were improperly added in the fourth quarter of 2001. *See* Compl. at ¶¶ 60, 137. Defendants argue that even had a factual basis for such a contention been pleaded, the number is immaterial because the number represents only one-tenth of one percent of Alamosa's subscribers for 2001 and one percent for the fourth quarter. Defendants also argue that even if the 1,000 subscribers were removed from the quarterly and year-end numbers, Alamosa would have still met its projected subscriber numbers for each of those periods.

In their Reply, Defendants state that "the Complaint's allegations that Alamosa improperly counted subscribers are no longer at issue because the [Response] does not refute that (a) no specific facts are alleged in the Complaint to support

any claim that a material number of improper subscribers were counted by Alamosa and (b) the only number of allegedly fictitious subscribers that the Complaint identifies (an allegation of 1000 subscribers) is immaterial as a matter of law." *See* Reply at 9 (citing Mot. Dismiss at 22–23).

The Court finds that, as argued by Defendants, Plaintiffs only alleged 1000 fictitious subscribers in their Complaint, and that number is immaterial as a matter of law when viewed in the context of the total number of subscribers added for the relevant quarter and year. If the entire alleged amount of 1000 were removed from the fourth-quarter 2001 amount and the entire year-end 2001 amount, Alamosa would have still reached its projected numbers.

### 2. False Financial Reporting

■■ Defendants argue that Plaintiffs "conced[e] that the Complaint failed to quantify the allegedly fictitious subscribers and accounts, or to connect these issues to Alamosa's financial statements[; thus,] Plaintiff retreats to the position that 'more important than the exact number of non-paying "customers" Alamosa counted as subscribers, Plaintiff alleges that overstated dollar value of pre-tax income and revenues for each quarter of the Class Period.'" *See* Reply at 12 (quoting Resp. at 12). Defendants assert that the Complaint, however, fails to plead a case of false financial reporting by stating in a conclusory manner that Alamosa had improper recognized revenues for subscribers whose payment was not "reasonably assured" or alternatively had not recorded sufficient allowances for uncollectible accounts. Defendants argue that the Complaint provides no factual basis for these allegations. Defendants contend that Alamosa has never been to restate its financial statements. Defendants further argue

that even if Alamosa had failed to comply with GAAP standards as alleged in the Complaint, non-compliance with GAAP alone will not support a federal securities fraud claim. *See Lovelace,* 78 F.3d at 1020; *Capstead,* 258 F.Supp.2d at 551 (citations omitted). Moreover, as argued above, Defendants contend that the confidential witnesses relied upon by the Plaintiffs were not competent to opine on the alleged accounting fraud.

### a. Facts Showing Improper to Recognize Revenue

The Complaint is not clear as to what amount of revenues Alamosa should have recognized from the NDASL/Clear Pay subscribers. Defendants argue that determining which accounts have a reasonable assurance of collectibility is a matter of judgment and estimate that depends on the particular facts, and the bare proposition that collectibility of revenues is not reasonably assured, without more, cannot support a claim for securities fraud. *See In re Galileo Corp. Shareholders Litig.,* 127 F.Supp.2d 251, 265 (D.Mass.2001). Defendants argue that the Complaint fails to identify any of the "less creditworthy" customers or explain why any of them would be less likely to pay that particular bill. As such, Defendants argue, no factual allegations have been pleaded to support the theory that revenue could not be recognized for subscribers under the NDASL/Clear Pay plans. *See Stack v. Lobo,* 903 F.Supp. 1361, 1368 (N.D.Cal.1995). Allegations must identify specific transactions in which there was improper revenue recognition and the materiality of such transactions and must identify any resulting restatements. *See Zishka v. American Pad & Paper Co.,* 2001 WL 1748741, at *2 (N.D.Tex. Sept. 28, 2001). Defendants further argue that the Plaintiffs again attempt to rely on information and belief of confidential witnesses yet provide none of the required detail for such sources. De-

fendants state that the confidential witness statements, and thus the Complaint, do not support the sweeping conclusions Plaintiffs ask this Court to infer. *See* Reply at 12.

The Court agrees with Defendants' arguments and finds that the Complaint fails to allege adequate detail as to the qualifications of the confidential witnesses and their positions in making the sweeping allegations charged in the Complaint.

### b. Failure to Plead Facts That Alamosa Misstated Allowance for Doubtful Accounts

Defendants argue that Plaintiffs' alternative allegation that Alamosa should have set aside a greater allowance for uncollectible doubtful accounts fails to plead facts demonstrating that Alamosa falsely set the amounts or that it misrepresented the approach it used to estimate the allowances. Defendants argue that each quarter's allowance was a forecast based on the exercise of business judgment and only reasonable predictions are required rather than perfect predictions. Defendants contend that the Complaint fails to plead facts, as opposed to conclusions, showing that Alamosa did not follow its own policy by taking into consideration the historical collection experiences, current trends, credit policy, and a percentage of its accounts receivable by aging category. Defendants argue that just the opposite is evident-Alamosa disclosed its estimating method and the factors it considered in making the assessment. *See* Def. Ex. 13 at App. 1632, 1676.

■ Defendants contend that Alamosa also reported that it had recorded increases to its allowances for doubtful accounts beginning in the third quarter of 2001 as compared to the first quarter of 2001. *See* Def. Ex. 12 at App. 1585; Ex. 2 at App. 296; Ex. 3 at App. 326; Ex. 13 at App. 1679. Defendants argue that Plaintiffs

have failed to plead with particularity that the amount kept in reserves was so low as to be fraudulent, especially in light of the fact that Alamosa had increased its reserve. *See Druskin v. Answerthink, Inc.,* 299 F.Supp.2d 1307, 1328 (S.D.Fla.2004). Defendants state that it is not enough to allege that an allowance for doubtful accounts was inadequate; rather, the Complaint must plead with specificity why the figures were the result of fraud and not merely business judgment. *See Seigel v. Lyons,* 1996 WL 634206, at *2 (N.D.Cal. Sept. 16, 1996). A company is not required to set its reserve at any predetermined percentage of receivables. *See Stack,* 903 F.Supp. at 1369. Defendants urge the dismissal of Plaintiffs' "fraud by hindsight" claims.

Plaintiffs assert that the increased bad debt expense over time supports its allegations that Alamosa's allowances for doubtful accounts and bad debt were without basis. *See* Resp. at 11–13 ("It is axiomatic that periods of improperly recorded revenue are followed by periods of elevated bad debt expense."). Plaintiffs wish to infer that Alamosa under-reported bad debt because bad debt expense increased during and after the alleged class period. Plaintiffs do not allege facts showing that the estimates for bad debt and allowances for doubtful accounts were unreasonable when made; nor do the confidential witness statements address these issues. Finally, Plaintiffs have failed to allege facts to show that the increased reported bad debt, most of which is alleged to have been reported in quarters following the alleged class period, is directly related to actions by Defendants that occurred within the class period. A conclusory allegation masquerading as fact will not suffice in a claim sounding in fraud.

### c. Review of Financial by Auditor

Defendants further argue that Plaintiffs' unsupported allegations that the numbers should have been different does not state a claim, especially when Alamosa has never been required to restate its financial statements for 2001 or 2002. *See Druskin,* 299 F.Supp.2d at 1326; *In re Credit Acceptance Corp.,* 50 F.Supp.2d 662, 680 (E.D.Mich.1999) (no fact set forth that defendants misrepresented revenues or understated reserves because none of the financial statements issued during the class period had to be restated). Defendants argue that the Complaint does not allege facts to contradict the approval of the financial statements by PricewaterhouseCoopers, the outside auditor who approved the statements without qualification. *See Druskin,* 299 F.Supp.2d at 1325–26 (allegations that defendants improperly recognized revenue was not established due to the fact that the company's auditors had issued unqualified opinion on company's financials). Defendants argue that the Complaint contains improper conclusory allegations and unwarranted inferences with no factual predicate or the required particularity as to the calculated amounts. *See* Compl. at ¶¶ 4, 140 (chart in the Complaint characterizing "appropriately stated" revenues). The Court agrees and finds that the Complaint contains improper conclusory allegations and unwarranted inferences with no factual predicate or the required particularity as to the calculated amounts.

### d. Confidential witnesses statements insufficient

In similar fashion to their previous arguments regarding the confidential witnesses, Defendants state that "[n]o foundation [was] laid from which it is even possible, much less reasonable, to infer that any of [the confidential] witnesses would have knowledge of how or even whether the information they claim to have seen in the field was rolled up to Alamosa's consolidated financial state-

ments that are alleged to be inaccurate." *See* Reply at 9–10. Defendants particularly take issue with the fact that the confidential witnesses were only alleged to work "out in the field" in sales and marketing areas but not in the corporate headquarters or in any role involved in drafting or preparing public disclosures and financial statements. *Id.* at 10. Defendants further argue that no allegations exist that the confidential witnesses had any background in accounting, access to information that demonstrates a company-wide scheme, or communications with anyone at Alamosa corporate headquarters regarding subscribers or revenues being improperly accounted for. *Id.* (citing Mot. Dismiss at 21). In essence, Defendants complain that the confidential witnesses are not competent to testify whether revenues or bad debts were fairly reflected in Alamosa's financial statements.

Defendants next argue that the confidential witness statements do not even purport to speak to accounting issues and a serious and fatal gap exists between what the Complaint alleges regarding revenues and bad debt and the confidential witness statements upon which these allegations are based. Defendants argue that such statements are simply incompetent to support the allegations in the Complaint. *See Shushany v. Allwaste, Inc.*, 992 F.2d 517, 523–24 (5th Cir.1993); *In re Capstead Mortgage Corp. Sec. Litig.*, 258 F.Supp.2d 533, 550 (N.D.Tex.2003) (state with particularity the facts to support the information and belief). Defendants argue that many of the confidential witness statements only speak to the effect of the Clear Pay program on the approval of new subscribers and the rate of churn but do not provide justification for claiming that the Clear Pay program and its effect was in any way fraudulent or resulted in any misleading financial statements. Rather, Defendants assert, the program was fully disclosed and is thus not actionable. *See* Ex. 8 at

App. 954–55 (elimination of deposit requirement for certain credit classes and stating that majority of new subscribers was under the new program); Ex. 11 at App. 1344 (customer churn higher in third quarter of 2001 than second quarter and will likely be even higher in the fourth quarter-attributable to the new NDASL program); Ex. 13 at App. 1611 (announced reinstatement of credit deposit to limit exposure to bad debt and discussed increased churn and expected increase in churn). Defendants urge the Court to prevent hindsight disagreement about the wisdom of adopting the Clear Pay program as a means to prop up an attempted claim of securities fraud. Defendants claim that there is an absence of factual allegations rather than a dispute over the facts. The Court agrees and adopts Defendants' argument on the issue.

### 3. Analysts' Statements

Each party devotes approximately one page of argument to whether the Complaint has sufficiently alleged that Defendants used securities analysts as conduits for false information. For an analyst's statement to be actionable, the statement must be attributable to the Defendants in some way—such as being adopted by Defendants or by showing that the Defendants used the analysts as conduits to the market. *Southland v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 373 (5th Cir. 2004). The Complaint must plead with particularity who supplied the information to the analysts, how the analysts received the information, and how the Defendants were entangled with or manipulated the information and analysts. *Capstead*, 258 F.Supp.2d at 562. Plaintiffs' Complaint must specify a particular statement, state when and where the statement was made, and what the speaker obtained thereby. *Barrie v. InterVoice–Brite, Inc.*, 2002 WL 1841631, at *2–4 (N.D.Tex. Aug. 8, 2002);

*Capstead,* 258 F.Supp.2d at 562. Without such specificity, the allegations must be dismissed. *Id.*

Defendants assert that they are not liable for statements made by analysts and that Plaintiffs have attempted to include the analysts' own statements as a basis for action, *see* Mot. Dismiss at 29 (citing Compl. at ¶¶ 87, 88, 92, 94, 99, 100, 101, 102, 103, 106, 108, 115, 221), because Plaintiffs realize that the individual Defendants actually made no misstatements. Defendants argue that the conclusory allegations in the Complaint stating that analysts' reports are "based on" or "reiterated" or "repeated" statements by Defendants are insufficient as a matter of law. *See Capstead,* 258 F.Supp.2d at 562; Compl. at ¶¶ 87, 88, 92, 94, 95, 103, 106. Defendants argue that the Complaint never specifies a particular statement by any analyst that any Defendant made or provides any facts showing why any particular statement was false. The Court agrees. Plaintiffs' Complaint fails to meet any of the particulars required in alleging a claim based upon analysts' statements.

#### 4. *Putative Class Period*

Defendants contend that Plaintiffs' core basis for the lawsuit is the May 2002 subscriber projection and the June 13, 2002 announcement of "truth," which exposed the "fraud" of the prior statement. Defendants argue that the purported class period has no logical connection to the May 2002 statement because the class period begins on January 9, 2001. Moreover, Defendants argue that the NDASL/Clear Pay plans were not even implemented until May of 2001. Thus, Defendants argue, subscriber number projections and final subscriber numbers which included any NDASL/Clear Pay customers all occurred following May 2001.

Defendants additionally argue that for periods of time after May 2001, Plaintiffs attempt to reach back and attack actual subscriber numbers and subscriber projections that were never restated as well as financial that have never been restated. The only subscriber projection that ever had to be restated was the May 2002 projection. Defendants argue that all other subscriber projections were met or exceeded. Defendants argue that no link exists between the second quarter 2002 subscriber projections and all prior quarters' subscriber numbers because the projections were met or exceeded.

The Court finds Defendants' argument to be persuasive; however, Plaintiffs' attempt to begin the alleged class period in January of 2001 is likely an attempt to include the Registration Statement within the class. The problem with such an attempt is that Plaintiffs, as discussed *infra,* have failed to properly allege a claim based on the Registration Statement.

### C. *GROUP AND PUZZLE PLEADING*

 Defendants take issue with Plaintiffs' repeated "group pleading," in that the Complaint often references "Defendants" rather than specifically alleging actions or omissions attributable to each individually named Defendant. Indeed, Plaintiffs' Complaint makes the bold statement that "[i]t is appropriate to treat the Individual Defendants as a group for pleading purposes...." *See* Compl. at ¶ 27. Such a statement directly controverts prior Fifth Circuit precedence. *See Southland v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 364–65 (5th Cir.2004) (stating that "this court has never adopted the 'group pleading' doctrine"). The Complaint, as pointed out by Defendants' Motion to Dismiss, contains repeated grouping of the Defendants without sufficiently identifying the speaker, the precise statement, facts which indicate the statements were false or misleading when made, or that they

were made with fraudulent intent. *See* Compl. at ¶¶ 78–83, 85, 93, 96, 98, 105, 109, 110, 113, 116, 127. Moreover, the Roberts Brothers are not even mentioned anywhere in the section of the Complaint titled "Defendants' False and Misleading Statements." *See* Compl. at ¶¶ 77–129.

Plaintiffs argue that the Complaint clearly alleges that Defendants Cowan and Sharbutt each personally made false statements contained in press releases, SEC filings, and through analysts. *See* Resp. at 13 (citing Compl. at ¶¶ 77–85, 87–96, 99–110, 115–118, 120–122). Plaintiffs contend that "because plaintiffs identify which defendants made which false statement, plaintiffs' allegations do not rely on the group pleading doctrine...." *Id.* Plaintiffs further argue that because "the Roberts brothers signed Alamosa's November 6, 2001 Registration Statement for Alamosa's common stock offering[,]" Plaintiffs have properly "plead[ed] their liability for the false and misleading statements issued during the Class Period." *Id.* at 14 (citing ¶¶ 24–26, 28–33). However, as argued elsewhere by Defendants, the Complaint contains no allegations regarding the Roberts Brothers and a November 6, 2001 registration statement.

Any allegations in the Complaint made against "Defendants" (plural or group) do not meet the requirements of pleading allegations of fraud and thus are **DISMISSED** without prejudice.

▇▇▇ Defendants also take issue with what they term as Plaintiffs' "puzzle pleading"—isolating allegations and elements while leaving it to the Court to infer a connection. Specifically, Defendants argue that the Complaint recites a list of allegedly false and misleading statements extracted from press releases, analysts' reports, and public filings and then follows the list with a summary paragraph that charges in a conclusory fashion that all the cited statements were false and misleading

because of a separately located second list Plaintiffs label as the true facts. Defendants further contend that the Complaint alleges, again in conclusory fashion, that the "true facts" were known by the Defendants because they had unspecified access to and review of unidentified internal Alamosa data. Defendants argue that in many instances the allegedly false and misleading statements are not referred to at all in the separate "true facts" list, nor do Plaintiffs attempt to explain why such statements are false and misleading. *See* Compl. at ¶¶ 77, 79, 82, 85, 90, 98, 112, 113. Defendants also assert that Plaintiffs never specify which of the various statements mentioned in the preceding paragraphs are false or misleading. Thus, Defendants state, Plaintiffs have left it to the Court to guess which statements are false and misleading and why each statement is false and misleading. The Court agrees completely.

Defendants cite to several court decisions dismissing complaints for "puzzle pleading." *See Williams v. WMX Techs., Inc.*, 112 F.3d 175, 180 (5th Cir.1980); *In re Capstead Mortgage Corp. Sec. Litig.*, 258 F.Supp.2d 533, 560–61 (N.D.Tex.2003) (attempting to overwhelm the court with conclusory, garrulous, and esoteric allegations simply does not get the job done; rather, plaintiffs should identify the specific statement and why it is false or misleading); *Thornton v. Micrografx, Inc.*, 878 F.Supp. 931, 937 (N.D.Tex.1995) (stringing together a lengthy series of premises and conclusory allegations does not equate to facts indicating that the statements were false or misleading).

Plaintiffs cite to *In re Honeywell Int'l Sec. Litig.*, 182 F.Supp.2d 414, 416 (D.N.J. 2002) for the proposition that its Complaint is neither confusing nor a puzzle-but even if it is, the puzzle is easy to put together. *See* Resp. at 4. However easy

the puzzle, assembling puzzles is not the duty of the Court. Rather, it is the parties' burden to present succinct pleadings which clearly lay out the elements as required by this Circuit. The Court will not waste its resources attempting to construe which statements are actionable and why each is actionable.

## D. SCIENTER

The question is whether the allegations of fraud are adequately connected to the Defendants to create a strong inference of scienter on their part. The Complaint must make the strong and specific showing of scienter as to each Defendant by stating with particularity the facts giving rise to a strong inference that the Defendant acted with the required state of mind. *See Zishka v. American Pad & Paper Co.,* 2000 WL 1310529, at *3 (N.D.Tex. Sept. 13, 2000); *Abrams,* 292 F.3d at 430; *Nathenson,* 267 F.3d at 407. Bare conclusory allegations that Defendants must have known about the allegedly fraudulent accounts and increased churn rates simply because of participation in conference calls, which involved meeting year-end subscriber number goals, will not suffice under the PSLRA. *See generally Goldstein,* 340 F.3d at 251. Likewise, Plaintiffs' attempts to base scienter pleadings on the confidential witness statements will not suffice because the allegations show no link between the confidential witnesses and any knowledge by any Defendant as to any allegedly improper activity. Because Plaintiffs have failed to raise a strong inference of scienter as to the Individual Defendants, it has also failed to establish scienter as to Alamosa. *See Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.,* 365 F.3d 353, 366 (5th Cir.2004) (corporate defendant's scienter determined by the scienter of the individual corporate official or officials who make or issue the statement). None of the confidential witness statements reported that Defendant Sharbutt was informed on any

of these conference calls that there were fictitious subscriber accounts known to be uncollectible. The setting of aggressive targets by management does not constitute securities fraud. *See In re Alpharma Inc. Sec. Litig.,* 372 F.3d 137, 150 (3d Cir.2004); *see also In re Bristol–Myers Squibb Sec. Litig.,* 312 F.Supp.2d 549, 568 (S.D.N.Y.2004).

Plaintiffs also attempt to infer fraud because of the individual Defendants' positions and the desirability of subscriber growth to Alamosa and all Defendants. Such desirability for growth is too universal a corporate goal to constitute a basis for scienter. Moreover, because Alamosa's bad debt expense was disclosed in its financial statements, no fraud can be found by Plaintiffs' simply alleging that the Defendants knew the increase in bad debt expense was impacting financials and that steps had to be taken to "wash the uncollectible accounts" off the books. Finally, alleging that the "truth" was revealed in the June 13, 2001 statement, in an effort to show that all prior quarters in the class period must have been fraudulent because an error was acknowledged, "will not wash under the PSLRA and Rule 9(b)." *See Galileo Corp. Shareholders Litig.,* 127 F.Supp.2d at 270. Moreover, Plaintiffs cannot use disclosures after the date of an alleged misstatement to show that knowledge must have existed at the earlier date regarding problems and that those problems should have been disclosed. *Id.* (citing authorities).

### 1. PSLRA's Strict Requirements for Pleading Every Challenged Act

Plaintiffs must allege what each Defendant knew, who specifically knew it, and when each learned of it. *See Zishka,* 2000 WL 1310529, at *3. Plaintiffs' generalized pleadings fail time and again to meet the strict requirements for pleading every

challenged act by a specific Defendant, specific misstatements, why actual knowledge should be inferred from a conclusory allegation, that the confidential witnesses were in a position from which it can be inferred that they possessed the information pleaded (specifically how witnesses involved in field activities knew how the corporate headquarters prepared public disclosures and statements), and specific facts showing materiality of the alleged misstatements.

### 2. Conscious Behavior or Severe Recklessness

██ Moreover, the Plaintiffs' general allegations that Sharbutt, Cowan, and the Roberts Brothers, because of their positions, were involved in the day-to-day operations of Alamosa and therefore must have been aware of the fraudulent accounts and "the accounts receivable situation simply lacks the requisite specificity." *Goldstein*, at 251; *Abrams*, 292 F.3d at 432 ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."). The Complaint's complete failure to connect Sharbutt, Cowan, or the Roberts Brothers in a manner that demonstrates involvement in the issuance of the allegedly fraudulent accounts is "critical regarding the ability [ ] to survive dismissal." *Goldstein*, at 251. The PSLRA standards do not entitle the Plaintiffs to make a conclusory assumption. *Goldstein*, at 252. The Complaint alleges that fraudulent accounts were approved and issued in the "field" at the direction of some unknown source above. *See* Compl. at ¶¶ 45–62. Such allegations will not suffice to overcome a motion to dismiss. The Complaint fails to tie Cowan, Sharbutt, or the Roberts Brothers to the issuance of fraudulent accounts. Allegations of non-specific internal reports are inadequate because an unsupported general claim about the exis-

tence of confidential corporate reports that reveal information contrary to reported information is insufficient to survive dismissal. *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir.2002). Such allegations must have corroborating details regarding the contents of the allegedly contrary reports, their authors, the recipients. *Id.*

Thus, the Court finds that the Complaint has failed to properly allege conscience behavior or severe recklessness.

### 3. Motive and Opportunity

The Fifth Circuit has held that a claim by plaintiffs that defendants engaged in securities fraud in order to inflate the price of the company's stock to allow for successful stock offerings, protect the executives' positions, and to enhance the value of personal stock holdings in the company would fail absent a showing that the defendants profited from the inflated stock price or the offerings. *Abrams*, 292 F.3d at 434.

### a. Universal corporate motives

██ Defendants argue that the Complaint alleges that "defendants" (group) were motivated to falsify financial statements and misrepresent net subscriber growth so that they could keep Alamosa's stock price high in order to (I) raise money by selling Alamosa securities and use proceeds to pay down Alamosa's debt and/or obtain waiver letters from lenders, and (ii) use Alamosa stock to fund acquisitions. *See* Compl. ¶ 5. Defendants contend that courts have found these goals to be so universal to public companies that they cannot be used to create a strong inference of scienter. *See, e.g., Melder v. Morris*, 27 F.3d 1097, 1102; *Azurix*, 198 F.Supp.2d at 889–90; *BMC Software*, 183 F.Supp.2d at 896; *Lemmer* v. *Kote Holdings, Inc.*, 2001

WL 1112577, at *10 (N.D.Tex. Sept. 6, 2001).

Defendants argue that the same defect is present in the Complaint's allegations that unspecified "defendants" were inflating subscriber growth to "show the market" that Alamosa was meeting the terms of its affiliate agreement with Sprint and to privately show lenders that it was meeting the covenants of its credit facility. *See* Compl. at ¶ 6. Defendants contend that several courts have rejected such allegations. *See, e.g., In re Cross Media Corp. Sec. Litig.*, 314 F.Supp.2d 256, 263–64 (S.D.N.Y.2004) (desire to raise capital or maintain compliance with financial covenants inadequate to support alleged intent to commit fraud); *Wilson v. Bernstock*, 195 F.Supp.2d 619, 636–37 (D.N.J.2002) (same); *In re E.Spire Communications, Inc. Sec. Litig.*, 127 F.Supp.2d 734, 744 (D.Md.2001) (same).

The Complaint alleges no underlying facts to support the allegation that Defendants were motivated by a desire to use Alamosa's stock as currency for acquisitions of new business or to meet covenants. *See Galileo Corp. Shareholders Litig.*, 127 F.Supp.2d at 270. The Court finds the Complaint to be insufficient in attempting to allege improper motive by way of pleading universal corporate motives.

### b. *Roberts Brothers stock sales*

Defendants argue that although the Complaint insinuates that all Defendants had a fraudulent intent because the Roberts Brothers sold some of their stock, the allegations regarding said sales by these outside directors create no such inference at all. First, Defendants argue that even unusual sales do not give rise to a strong inference of scienter when other defendants do not sell some or all of their shares during the class period. *Abrams*, 292 F.3d at 435. The Complaint makes no allegations that either Defendant Sharbutt or Cowan sold *any* shares during the putative class period. To the extent that the allegations center around the Roberts Brothers' sales, scienter may not be inferred "strongly" when fraud is alleged to have benefited only a single defendant in a corporate entity and not numerous defendants. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996); *Acito*, 47 F.3d at 54.

Defendants also argue that the mere fact that "non-speaking" individual defendants sold stock is not probative of scienter. The Complaint lacks even one allegation connecting the Roberts Brothers to any alleged misrepresentation; and without any such allegation, the Roberts Brothers' stock sales are not probative of Defendants' scienter. *See BMC Software*, 183 F.Supp.2d at 902 (stock sales by non-speaking defendants irrelevant because state of mind of defendants alleged to have made misstatements is considered by the court). Courts have held that even where non-speaking defendants sold the majority of their shares, a strong inference of scienter was not met because the defendant making the allegedly fraudulent statement had not sold shares. *See In re Scholastic Corp. Sec. Litig.*, WL 91939, at *13 (S.D.N.Y. Jan. 27, 2000); *Head v. NetManage, Inc.*, 1998 WL 917794, at *5 (N.D.Cal. Dec. 30, 1998).

Defendants further argue that the sales by the Roberts Brothers were in no way suspicious or unusual. Rather, in accordance with the terms of the acquisition agreement between Alamosa and the Roberts Brothers executed upon the sale of their business to Alamosa, the Roberts Brothers sold their shares following the expiration of the lock-up period. Defendants point out that some of the alleged Roberts Brothers insider sales occurred before many of the alleged misstatements

regarding subscriber number projections. *See Stevelman v. Alias Research Inc.,* 174 F.3d 79, 85 (2d Cir.1999) (citing authority for proposition that sales before alleged misrepresentations are inconsistent with theory of securities fraud scienter).

Plaintiffs argue that the Roberts Brothers' sales were in suspicious amounts and at suspicious times. *See* Resp. at 27. Plaintiffs, however, do not rebut Defendants' argument that the Roberts Brothers were outside directors, not officers of the company, and never made any alleged specific misstatements. Moreover, as argued by Defendants in their Reply, Plaintiffs cannot amend the Complaint by way of the Response to attempt to include an allegation that the Roberts Brothers signed a November 6, 2001 registration statement that was never mentioned in the Complaint. *See Coates v. Heartland Wireless Communications, Inc.,* 55 F.Supp.2d 628, 644 n. 26 (N.D.Tex.1999). Finally, it is undisputed that the Roberts Brothers' sales began on October 1, 2001, the expiration of the lock-up period. Furthermore, it is undisputed that neither Defendant Sharbutt nor Cowan sold any of their stock during the alleged class period. These two Defendants are the only individual Defendants alleged to have made specific misstatements. As such, no specific alleged misstatements are attributable specifically to the Roberts Brothers.

Thus, the Court finds that the Complaint fails to make a strong showing of scienter regarding the Roberts Brothers' stock sales.

## E. LOSS CAUSATION FOR STATE-MENTS NOT MENTIONED IN "CORRECTIVE" DISCLOSURE

■ Next, Defendants assert that Plaintiffs must prove that the alleged fraud "caused the loss for which the plaintiff seeks to recover damages." *See* 15 U.S.C. § 78u–4(b)(4). Defendants argue that Plaintiffs can only meet the loss causation upon a showing of a causal connection between the alleged misrepresentation or omission and the investment's subsequent decline in value. *See Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 (5th Cir.1981), *rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Loss causation refers to a direct link between the misstatement and a plaintiff's loss, *Nathenson,* 267 F.3d 400, 413 (5th Cir.2001), and generally requires a corrective disclosure relating to the challenged representations, followed by a decline in the stock's price. *Huddleston,* 640 F.2d at 549.

As stated by Defendants in their Reply, as well as by this Court's judicial notice, approximately 80 percent of the decline in Alamosa's stock price occurred before the May 1, 2002 subscriber projection and the June 13, 2002 revision. Although Plaintiffs have alleged a purported class period to extend as far back as January 9, 2001, Plaintiffs have failed to allege any corrective disclosures (dealing with any matter relevant to this lawsuit) other than the June 13, 2002 revision of second quarter 2002 subscriber number projections. Such an absence is either sloppy pleading or concedes that no other disclosures were made. The Complaint also fails to allege any link between any of the other alleged misconduct to the May 1, 2002 statement or any other public statement made by Defendants which could be viewed as a disclosure.

Defendants argue that Plaintiffs' own allegations defeat the element of loss causation because the Complaint alleges that Defendants' misrepresentations and omissions "artificially inflated" Alamosa's stock price until June 13, 2002—at which time the "truth" was revealed. *See* Compl. ¶ 127. Defendants argue that the only relevant information revealed on June 13,

2002, was Alamosa's revision to its projected net subscriber additions for the second quarter of 2002. *See* Def. Ex. at App.1951. Defendants contend that the June 13, 2002 press release did not contain any "corrective" information about any of the other so-called misrepresentations or omissions allegedly made throughout the putative class period. Thus, Defendants conclude, in the absence of any "corrective" disclosure that these other challenged representations/omissions were false and followed by a stock price drop, Plaintiffs cannot show a causal connection between these other alleged misstatements (statements other than the May 2002 statement which included the subscriber projection) and a subsequent decline in the value of Plaintiffs' investment. *See Huddleston,* 640 F.2d at 549.

Plaintiffs counter that they are only challenging the reference to total subscribers contained in the May 1, 2002 statement rather than the subscriber projection numbers. *See* Resp. at 32–33. This is a turn from the general direction of Plaintiffs' Complaint challenging the revisions. As Defendants correctly point out, the June 13, 2002 revision *only contains corrective information about the subscriber projection numbers for that quarter* and fails to contain any other corrective information—specifically no corrective information about total actual subscribers or any omissions/misrepresentations. *See* Def. Ex. 29 at App.1951. Thus, as Defendants again correctly point out, the only basis for satisfying the loss causation requirement was the May 1, 2002 subscriber projections (which Plaintiffs admit in their Response that they are not challenging). Defendants argue that Fifth Circuit precedent bolsters the precedence of other circuits which have recognized that loss causation requires that a plaintiff not only purchase the stock at an artificially inflated price, but that the alleged misrepresentations or omissions also cause the price to decline.

*See Nathenson,* 267 F.3d at 417 (no claim where stock declined during period of alleged misrepresentation and then rose after corrective disclosure); *ABC Arbitrage Plaintiffs Group,* 291 F.3d at 361–62 (failure to allege materiality/reliance when stock fell after announcement of negative news that did not contain any corrective disclosure).

Moreover, Defendants contend that there has been no disclosure that Alamosa's revenues, actual subscriber numbers, or bad debt expenses were misstated; rather, Plaintiffs summarily and in a conclusory fashion allege that those items were misstated. Plaintiffs attempt to avoid dismissal on the loss causation element by relying upon a Ninth Circuit opinion holding that "loss causation does not require pleading as stock price drop following a corrective disclosure or otherwise." *Broudo v. Dura Pharms., Inc.,* 339 F.3d 933, 938 (9th Cir.2003), *cert. granted,* —— U.S. ——, 124 S.Ct. 2904, 159 L.Ed.2d 811 (2004). Defendants argue that this Ninth Circuit opinion is contrary to the weight of authority, and even the SEC, by way of amicus brief, has argued that the decision is wrong, following which the Supreme Court granted writ of certiorari to resolve the question. Defendants' argument goes on to quote the SEC brief at length. *See* Reply at 4–5. The Court believes the amicus brief has laid out a persuasive argument. To follow the Ninth Circuit reasoning would, in effect, create an insurance policy for any drop in stock price. Thus, the Court finds that Plaintiffs have failed to properly allege loss causation. Because none of the other alleged misrepresentations or omissions beyond the May 1, 2002 subscriber number projections were the subject of a corrective disclosure followed by a drop in stock price, there can be no finding that such misrepresentations or omissions caused Plaintiffs'

losses.[8] Plaintiffs have failed to plead an essential element of a 10b–5 claim.

## 1933 ACT

### A. STATUTE OF LIMITATIONS FOR SECTION 11 CLAIMS

■ Defendants argue that because Plaintiffs did not file their Section 11 claims within one year after the Plaintiffs discovered, or should have discovered, the alleged misrepresentation or omission, or within three years after the security was offered to the public, those claims should be dismissed. *See* 15 U.S.C. § 77m. Defendants argue that Plaintiffs failed to file their Section 11 claims within one year following the appearance of "storm warnings" that would have alerted the reasonable investor to the possibility of a misrepresentation or omission. *See Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 352 n. 3 (2d Cir.1993); *Jensen v. Snellings*, 841 F.2d 600, 606–07 (5th Cir.1988).

Defendants further contend that Plaintiffs must affirmatively plead compliance with the statute of limitations, as set forth in Section 13, when asserting their claims under the 1933 Act. *See Steiner v. Southmark Corp.*, 734 F.Supp. 269, 278 (N.D.Tex.1990). Defendants argue that Section 13 is "an essential substantive ingredient" of a statutory cause of action under the 1933 Act, *Bresson v. Thomson McKinnon Sec., Inc.*, 641 F.Supp. 338, 343 (S.D.N.Y.1986), and "not merely an affirmative defense to be raised by defendants." *Ambling v. Blackstone Cattle Co., Inc.*, 658 F.Supp. 1459, 1462 (N.D.Ill.1987).

In a response to Plaintiffs' attempt to invoke a two-year statute of limitations provision established under the Sarbanes–Oxley Act, 28 U.S.C. § 1658, *see* Compl. ¶ 181, Defendants argue that courts have repeatedly held that this extended limitations period is for claims of fraud and does not apply to Section 11 claims, which do not include an intent requirement. *See In re Global Crossing. Ltd. Sec. Litig.*, 313 F.Supp.2d 189, 198 (S.D.N.Y.2003); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F.Supp.2d 243, 265 (S.D.N.Y.2003); *Friedman v. Rayovac Corp.*, 291 F.Supp.2d 845, 847 (W.D.Wis. 2003); *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 431, 444–45 (S.D.N.Y.2003); *Miller v. Nationwide Life Ins. Co.*, 2003 WL 22466236, at *2 (E.D.La. Oct. 29, 2003). Plaintiffs fail to cite to a single case in support of their argument that the longer limitations period should apply. *See* Resp. at 38–39. Defendants urge dismissal because the Complaint does not and cannot plead compliance with the one-year limitations period.

Furthermore, Defendants argue that the Complaint itself demonstrates that Plaintiffs were on notice of the facts giving rise to the Section 11 claim for more than one year prior to asserting it because, according to the press release, the June 13, 2002 statement was an "admission" of an earlier misrepresentation. *See* Compl. at ¶ 127. Defendants state that because the alleged misrepresentation made in May of 2001 is central to Plaintiffs' claims, the June 13, 2002 "admission" put Plaintiffs on inquiry notice of any misrepresentations or omissions alleged to be contained in the January 12, 2001 Registration Statement. *See In re USEC Sec. Litig.*, 190 F.Supp.2d 808, 816 (D.Md.2002). Thus, Defendants argue, because the Complaint identifies the June 13, 2002 press release as revealing the "truth," Plaintiffs were on notice at that time and the limitations period began

---

8. Plaintiffs now argue that they are not challenging the subscriber projection numbers, the only statement subject to a corrective disclosure. *See* Resp. at 32–33 (essentially abandoning claims on the subscriber projection numbers in the May 1, 2002 press release).

running. This Complaint was filed May 17, 2004.

The Court finds that Plaintiffs were on notice following the June 13, 2002 press release. The Court finds that the one-year limitations period properly applies to Plaintiffs' Section 11 claims in this case and that Plaintiffs should have filed suit within one year after said date. Plaintiffs failed to do so. Moreover, even taking into consideration the consolidated complaints, a November 19, 2003 filing is also too late.

## B. ALLEGATIONS OF STANDING TO BRING SECTION 11 CLAIM

 Defendants contend that the Lead Plaintiff lacks proper standing to bring a claim under Section 11. The Fifth Circuit has held that in order to have proper standing, a purchaser must have bought the shares directly from the issuer or underwriter in the initial offering or be a secondary market purchaser who sufficiently alleges that the shares are traceable to the challenged registration statement. See Rosenzweig, 332 F.3d at 872–73; Krim v. pcOrder.com, Inc., 210 F.R.D. 581, 586–87 (W.D.Tex.2002), aff'd, 402 F.3d 489 (5th Cir.2005). Defendants argue, and the Court agrees, that the Complaint is defective as to properly pleading either avenue of standing. See Compl. at ¶¶ 172 and 78 (by referencing Reg. Stmt.). Defendants contend that the January 2001 Registration Statement was filed for the limited purpose of registering stock in connection with Alamosa's reorganization after it had acquired various companies, but not in order to register stock for sale to the public generally. Defendants also argue that the Lead Plaintiff does not allege that it purchased shares in the purported offering or traceable to the January 2001 Registration Statement. Rather, Defendants argue, the Lead Plaintiff's first purchase was not until January 11, 2002 (one

year after the complained-of Reg. Stmt.). See Def. Ex. 35 at App.2013.

Plaintiffs argue that "any person acquiring" a security issued by way of registration statement or prospectus that contained an untrue statement of material fact has standing to sue under Section 11. See 15 U.S.C. § 77(k)(a). Plaintiffs further argue that the Complaint specifically alleges that the Plaintiffs bought Alamosa securities "traceable to the false and misleading Registration Statement." See Compl. at ¶ 35. Plaintiffs reason that "[t]hese allegations are more than adequate to plead standing under the 1933 Act." See Resp. at 36. Plaintiffs further argue that the shares need not be purchased in the offering as defined by Defendants. Finally, Plaintiffs assert that the Lead Plaintiff need only allege that its shares are "traceable" to the Registration Statement and need not allege facts in support thereof. See Resp. at 37–38 (citing Compl. at ¶¶ 35, 176).

After a careful review of the Complaint, the Court is unable to locate any specific allegation that the Lead Plaintiff purchased traceable shares or any facts to support such an allegation. Although Plaintiffs cite to paragraphs 35 and 176 of the Complaint, neither paragraph specifically pleads that the Lead Plaintiff purchased traceable shares. Moreover, mere probability that a plaintiff can trace shares is clearly insufficient. See, e.g., Krim v. pcOrder.com, Inc, 402 F.3d 489 (5th Cir. 2005). Thus, the Court finds that the Lead Plaintiff lacks standing to bring a Section 11 claim.

## C. MISLEADING JANUARY 2001 REGISTRATION STATEMENT

 Defendants argue that Plaintiffs' Section 11 claim fails to allege that any statement in the January 2001 Registration Statement was misleading because the

only substantive paragraphs incorporated into the Section 11 claim are paragraphs 78 and 86 of the Complaint. *See* Compl. at ¶ 172. Although the Complaint alleges at paragraph 86 that the Registration Statement contained false and misleading statements regarding subscriber additions and revenues, Defendants contend that the allegations use improper puzzle pleading. *See* Compl. at ¶ 86. According to Defendants, the statements alleged to have been false and misleading only discuss the mechanics of the merger with Roberts Wireless and WOW. *See* Compl. at ¶ 78(a). Defendants argue that none of the statements in the Registration Statement is relevant to subscriber additions and that all the conduct challenged in this lawsuit (signing up NDASL and Clear Pay subscribers) is alleged to have occurred after the January 2001 statement—thus leaving no improper conduct to have been misrepresented in the January 2001 Registration Statement because none of the alleged conduct had yet occurred. Moreover, Defendants state that they were under no obligation to cast Alamosa's business in a pejorative light. *See Rosenzweig,* 332 F.3d at 869; *Abrams,* 292 F.3d at 433. Thus, Defendants urge dismissal of the Section 11 claim because Plaintiffs fail to properly allege an actionable misrepresentation or omission in the Registration Statement.

Plaintiffs counter by arguing that each person who signed the Registration Statement is *prima facie* liable to the purchasers of the stock and that Alamosa's liability is absolute as an issuer of stock pursuant to the allegedly defective Registration Statement. Plaintiffs argue that the Complaint pleads that the Registration Statement contained misrepresentations and omissions that were material at the time, *see* Resp. at 41 (citing Compl. at ¶¶ 78(b), 86), and base their argument upon the Complaint's allegation that the Registration Statement omitted any discussion of the alleged subscriber manipulations and financial fraud alleged in the Complaint. *Id.* Plaintiffs challenge Defendants' argument that "all the conduct challenged in this suit allegedly occurred after the filing of the [Registration Statement]." *Id.* Plaintiffs further argue, by way of footnote 43, that any omissions up to the date shareholders approved the merger (about one month after the Registration Statement was *filed*) are actionable. However, Plaintiffs fail to cite any authority for such a proposition. *Id.* at 41 n. 43.

The Court finds that the Registration Statement was filed prior to any of the alleged subscriber manipulations contained in the Complaint. Moreover, the Court finds that Defendants were under no obligation to cast Alamosa's business in a pejorative light. There can be no legally cognizable claim here because the Complaint does not allege that subscriber manipulations occurred prior to the filing of the January 2001 Registration Statement.

### D. NEGATIVE CAUSATION DEFENSE

An affirmative defense to Section 11 liability is that the Plaintiffs' claims are not attributable to the alleged misrepresentation or omission. 15 U.S.C. § 77k(e). If the negative causation defense is apparent on the face of a complaint, dismissal under Rule 12(b)(6) of the Section 11 claim is proper. *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 272 F.Supp.2d 243, 253–54 (S.D.N.Y.2003). "[A]s a general rule price decline before disclosure [of the truth] may not be charged to defendants." *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 65 F.3d 1044, 1049 (2d Cir.1995).

Defendants argue that Plaintiffs' own Complaint alleges that Alamosa's stock plummeted in response to the June 13, 2002 press release "admission." *See*

Compl. at ¶¶ 127, 128. Defendants contend that the June 13 press release spoke only to the subscriber additions for second quarter 2002, but not to any prior periods. Moreover, Defendants argue that the January 2001 Registration Statement is not mentioned at all in the June 13, 2002 press release or in any corrective statements regarding it. Thus, Defendants conclude, Plaintiffs' own allegations demonstrate that any loss experienced by Plaintiffs could not be attributable to an alleged misrepresentation or omission from the Registration Statement and Plaintiffs' Section 11 claim is subject to the absolute negative causation defense.

Plaintiffs claim that Defendants point to no proof that investors lost money from their Alamosa purchases due to circumstances other than the untrue Registration Statement. However, as stated above, Defendants specifically point to Plaintiffs' own Complaint, alleging that Alamosa's stock plummeted in response to the June 13, 2002 press release "admission," *see* Compl. at ¶¶ 127, 128, which is a circumstance other than the untrue Registration Statement. Thus, the Court finds that Plaintiffs' own pleadings demonstrate that any loss experienced by Plaintiffs could not be attributable to an alleged misrepresentation or omission from the Registration Statement. Plaintiffs' Section 11 claim is subject to the absolute negative causation defense.

### *CONTROL PERSON LIABILITY UNDER 1934 AND 1933 ACTS*

Defendants' succinct argument is that Plaintiffs have failed to state a claim for primary liability; thus, the claim for secondary liability under Section 20(a) of the 1934 Act and Section 15 of the 1933 Act fails. *See Southland,* 365 F.3d at 383–84; *Lovelace,* 78 F.3d at 1019 n. 8. The Court agrees.

### V.

### CONCLUSION

"While it is unfortunate that the Plaintiffs in this case lost money in their investments, their misfortune alone does not create a viable cause of action." *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 551 (8th Cir.1997). "The federal securities laws should not be mistaken for insurance against risky investments; the federal reporters are replete with failed attempts to do just that." *Searls v. Glasser,* 64 F.3d 1061, 1069 (7th Cir.1995). Fraud by hindsight is not an actionable claim under the securities laws. The setting of forward projections which ultimately fail to materialize cannot form the basis for a securities fraud action under the circumstances of this case. As the Fourth Circuit has explained,

> [p]redictions on future growth ... will almost always prove to be wrong in hindsight. If a company predicts twenty-five percent growth, that is simply the company's best guess as to how the future will play out. As a statistical matter, twenty percent and thirty percent growth are both nearly as likely as twenty-five. If growth proves less than predicted, buyers will sue; if growth proves greater, sellers will sue. Imposing liability would put companies in a whipsaw, with a lawsuit almost a certainty. Such liability would deter companies from discussing their prospects, and the securities markets would be deprived of the information those predictions offer. We believe that this is contrary to the goal of full disclosure underlying the securities laws, and we decline to endorse it.

*Raab v. General Physics Corp.,* 4 F.3d 286, 290 (4th Cir.1993).

Plaintiffs' Complaint is **DISMISSED.**[9]

**SO ORDERED.**

**9.** Almost as an afterthought, and in a footnote nonetheless, Plaintiffs state that "[i]f the Court should dismiss the Complaint, plaintiffs request leave to amend...." *See* Resp. at 44 n. 45. The Local Rules for the Northern District of Texas clearly require that any document containing more than one motion, pleading, or other paper must clearly identify each in its title. *See* LR 5.1(c). Plaintiffs failed to comply with said local rule, and the Court will not consider its request. Moreover, motions to amend require a certificate of conference. LR 7.1(h). Finally, Plaintiffs failed to comply with Local Rule 15.1 requiring that a copy of the proposed amended pleading be attached to the motion. *See also U.S. ex rel Willard v. Humana Health Plan of Texas, Inc.,* 336 F.3d 375, 387 (5th Cir.2003) (citing *Confederate Mem'l Ass'n, Inc. v. Hines,* 995 F.2d 295, 299 (D.C.Cir.1993) ("[A] bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which the amendment is sought,

... does not constitute a motion within the contemplation of Rule 15(a).")).

To the extent that amendments "shall be freely given," this Circuit as well as other courts have admonished one of the very law firms representing the plaintiffs in this case against the "wait and see approach" to amending the Complaint. *See Goldstein,* 340 F.3d 238, 255 n. 6. Here, Defendants' Motion to Dismiss has been filed for nearly eight months. Plaintiffs were certainly aware of Defendants' objections to the Complaint as written (because objections appeared in the principal motion). *See id.* Despite this awareness, Plaintiffs neither demonstrated to the Court in their footnote how they would re-plead more specifically to correct the problems with their Complaint if given the opportunity, nor proffered a proposed amended pleading. *See id.* Eight months is certainly more than adequate time for Plaintiffs to have corrected the problems with the Complaint.